J. S. EASON, Administrator, Appellant, v. DES MOINES ELECTRIC COMPANY, Appellee.

**NEGLIGENCE:**   Contributory Negligence—Insulated Electric Wires.
1   A jury question is presented on the issue of contributory negligence when the jury might find that the deceased unnecessarily took hold of an insulated electric wire, with knowledge, and after being warned, of its dangerous condition.

**TRIAL:**   Instructions—Pleadings Control.   Error may not be predicated on lack of clearness in instructions, when they are fully as broad as the pleadings, and are in harmony with the statements of counsel to the court.   So held where the pleading and counsel's statements to the court rested the question of negligence on the *original* setting of a pole, and not on its subsequent maintenance.

*Appeal from Polk District Court.*—LAWRENCE DE GRAFF, Judge.

JANUARY 20, 1920.

ACTION by the administrator to recover damages on behalf of the estate of deceased for his death, caused, as is alleged, from the negligence of the defendant.   There was a trial to a jury, and a verdict and judgment for the defendant.   The plaintiff appeals.—*Affirmed.*

*Miller, Parker, Riley & Stewart, Webb & Webb,* and *H. L. Bump,* for appellant.

*Charles S. Bradshaw,* for appellee.

PRESTON, J.—Omitting formal parts, the petition alleges, substantially, that, on October 17, 1917, deceased, an employee of one Nugent, a commission dealer in horses, was working in and about the stockyards of one Talbott, in the city of Des Moines, which stockyards were the place of business of Nugent. Defendant was dispensing electric current to the various industries about the stockyards, and maintained a line of wires to a point about 25 feet from the northeast corner of the rendering works operated by Percival, at which point there was located a wooden pole, 40 feet in height, to support the wires. Said pole was located about 150 or 200 feet southwest of the stockyards. Said wires ran northeasterly from said pole, 200 or 300 feet, to another pole of similar height, located in the middle of the Talbott stockyards. A large number of Nugent's horses were in the stock pens of Talbott. In the early morning of the date stated, the pole near the Percival works fell to the ground, causing the wires to fall into and across the stock pen where the horses were located. Deceased was directed by his employer to assist in removing the horses from the stock pen across which the wires had fallen, the fallen wires being in a portion of a stock pen, suspended a short distance above the ground, and resting upon a portion of the fence surrounding the stock pen, and upon a feed trough therein. The horses were to be removed, to prevent injury to them. The petition further alleges that, in attempting to reach the horses, and drive them away from the wires and out of the pen, deceased laid hold of the wires at or near the place where they were suspended across the feed trough; that deceased was instantly killed by the electric current; that deceased had no knowledge or notice that the wires carried an electric current at the time he came in contact with them; that, at the time of the death of deceased, the pole

1. NEGLIGENCE: contributory negligence: insulated electric wires.

located at the northeast corner of the Percival works had not been and was not set in the ground by the defendant herein, but had been merely placed in a pile of ashes, which ashes had worked away, and permitted said pole to fall; that the said pole was not properly supported, and had no support to hold the same in position; that deceased was not guilty of contributory negligence; that defendant was negligent in this: (1) In failing to place and set said pole, at the corner of the Percival rendering works, deeply and firmly in the ground, for the support of the same. (2) In failing to properly mark said pole with any danger sign whatever, and in failing to notify this defendant [plaintiff], or this defendant's [plaintiff's] employer, of the danger contained in said wires. Other grounds of negligence were set out, but they were not submitted, and we do not understand appellant to complain of such failure.

The answer admits that one of defendant's poles, in the neighborhood of the stockyards described in the petition, fell, on or about the date alleged, and that deceased, in attempting to remove one of the wires which had been attached to said pole, picked up the wire, and was instantly killed; denies generally allegations not admitted; denies that it was negligent; alleges contributory negligence on the part of deceased. Appellant states in argument that this appeal is based upon the proposition that the verdict of the jury, which was not in favor of the defendant, is contrary to the evidence, is wholly unsupported by the evidence, and is the result of passion and prejudice, and is contrary to law. At the time the city ordinances were offered, which, we understand from the additional abstract, was at the close of the defendant's evidence, counsel for appellant stated to the court:

"There are two things in this case that I think are for the consideration of the jury, and one is the negligence of the defendant in reference to the setting of that pole.

"Court: You need not argue that; I will submit that.

"Mr. Miller (continuing) : And the other is as to the conduct of the plaintiff. Those are the questions I want to argue to the jury, and I want to argue to the jury, as bearing upon the question of the conduct of the plaintiff, the fact that this appeared to be, and, so far as the evidence shows, was, an insulated wire.

"Court: I shall tell the jury to consider that question."

In stating the facts, we shall attempt to state only such as bear on these two propositions, with, perhaps, some additional facts which may appear to have a bearing on some other questions presented here.

It was shown by the evidence, or, upon a conflict therein, the jury could have found, that the pole which fell had been set in place about three years before, in a pile of cinders 15 feet long one way and 18 feet the other, and 5 or 6 feet deep. It did not go through the cinders, so as to be set in the soil. It was seated beside the stump of another pole. The person who set it testifies that it was securely set at that time. About a year or more before this accident, the cinders from the outer side of the pile had been removed by persons other than the defendant, leaving a mound of cinders a few feet across and surrounding the pole. The defendant had been notified of the condition of the pole prior to the accident. The pole carried three good-sized insulated wires, with a voltage of 2,300. The wires were as large as the little finger, or larger. About 9 o'clock in the morning, or a little before, on the day in question, the pole was blown down by a high wind, carrying with it the three wires, which fell to the ground outside of the stockyards, the wire resting on the top wire of two barbed wires, which were strung along the top of the west tight board fence of the stockyards. The board part of this west fence was 8 or 10 feet high, above which were the two barbed wires, making the fence 10 or 11 feet high. In con-

tact with the barbed wires, one or more of the electric wires, either immediately, or soon afterwards, burned off one or more of the barbed wires, making a noise described as like that of the crackling of burning weeds. From the top of the west fence, the electric wires sagged, as they ran to the northeast, in the stock pen, the low point being over a feed trough, which ran north and south in the stock pen, about 18 feet from the fence, and parallel therewith, the wires touching the feed trough, and then ran at a sharp angle upward to the top of the next pole, which was in the stock pen farther east than the feed trough, and 35 or 40 feet high. The wires dropping down from the pole and passing to the west fence crossed the feed trough some feet south of the north end of it. From the north end of the feed trough to the north fence of the stock pen, it was about 55 or 60 feet, making the space north of the wires, where down, about 18 feet, east and west, by 60 or more feet north and south, and open to the west fence. The wires were not down within reach on the east side of the feed trough, and, after sagging to the feed trough, they ran up again to the high fence, 18 feet away. The stock pen was 83 feet north and south, and 110 feet east and west. The feed trough was about 23 feet long, 2½ feet wide, and 3½ feet high. A part of a large plat is here set out, showing the stock pen. The pole that fell was located southwest, and the rendering works still farther west or southwest.

The decedent's employer on that morning had about 50 horses in the stock pen. Foley, Chesney, deceased, and the employer, Nugent, were in the inspection sheds, which were a part of the same stockyards, to show horses. A short time before the accident, the electric lights went out, all over the stockyards, including the place where deceased and the others were. This was observed and commented upon. About ten minutes after the pole fell, Talbott, the owner of the stockyards, received notice by telephone from some-one connected with the Percival plant, advising him that the wires were down, that they were dangerous, and that the horses should be gotten out of the pen. Talbott notified Nugent's employee, Ray, who was then east of the stock pen, of the word he had received by phone. Ray proceeded south to the inspection place, which is southwest of the stock pen, where he found Chesney, Foley, Nugent, and the deceased, and repeated, within hearing of all, as ap-

pellee contends, the substance of the message received from
Talbott. There is evidence showing that this message was re-
peated in the presence of deceased, but there is a conflict in
the evidence as to this.   Chesney, who was Nugent's son-in-
law, and the manager, directed deceased, Foley, and Ray to
proceed with him to the stockyards to get the horses out.
They proceeded west from the inspection place, thence
north through the alley, and through the gate at the south-
east corner of the feed pen, which contained the horses;
they proceeded west along the south fence in the feed pen
to a point near the west fence and south of the feed trough.
Meanwhile, Talbott had entered the feed pen, and was keep-
ing the horses away from and north of the fallen wires, and
up along the north side of the pen.  The horses were quiet,
and apparently had not sensed any danger.  They were
along the north fence, and, according to some of the wit-
nesses, east of the wire and of Talbott—though there is
some dispute about this; some of the witnesses claim that
they were farther west.  Chesney walked up the east side of
the feed trough, and under the wires as they ran up to the
pole, and joined Talbott in herding the horses.  Deceased,
followed by Foley, a few feet behind, approached the down
wires, going west around the south end of the feed box,
and, instead of passing under the wires, as appellee con-
tends he could have done, east of the feed trough or along
the west fence, he took hold of one of the wires, apparently
for the purpose of raising it and pushing it up and over the
west fence.  He was not able to let loose of the wire, and fell
to the ground, pulling the wire further down with him, and
so remained until, some minutes later, an employee of de-
fendant's arrived, and removed the wire from the grasp of
deceased.  Deceased died as a result of the contact.  This
was between 9 and 10 o'clock in the morning.

There is evidence, and the jury could have found, that
none of the horses were, at any time, near enough to the

wire to be in danger of receiving a shock, or becoming entangled in the wires; that none of them were nearer than 50 or 60 feet north. There is testimony that Talbott and others "hollered" to deceased to look out, and not touch the wire, when deceased was walking towards it. Talbott says that deceased did not make any reply, and he does not know whether he heard him; that deceased kept right on moving; did not run toward the wire, but seemed to quicken his pace; that he addressed his remark to deceased. Plaintiff's witnesses testify that no warning was given deceased before he took hold of the wire, thus making a conflict at this point. Perhaps we ought to go a little more into detail as to one or two of the conditions. Ray, a witness for plaintiff, testifies that deceased, Chesney, and Foley were at the inspection place, and sitting there when he, Ray, delivered Talbott's message to Nugent. The lights went out before Talbott sent word down there. Witness knew that Talbott was talking about electric light wires; knew there was something wrong with the current. The lights went out where deceased was. The first thought of witness was that the horses should be kept away from contact with the electric wires. He went there to get the horses out; presumed the wires might be dangerous; didn't know to what extent; didn't know whether the horses would get shocked or tangled up. There were no horses in the southwest corner. Chesney, testifying for plaintiff, says he noticed that, where the wire had crossed the fence, it was burning at different places along the wire; could see sparks fly, after deceased fell to the ground; observed that, just as soon as he turned around and saw deceased in trouble; observed that at that time. It is not claimed that anyone told plaintiff that the wires were carrying a dangerous current of electricity. Talbott says he did not tell him or anyone else, and says they had the same chance to know and the same right that he did, just from general knowledge of

electric wires. There was no sign or warning posted in the stockyards on the wire or pole. Counsel for each party points out circumstances bearing on the interest of the different witnesses and the contradictions, but we do not deem it necessary to go into the evidence further. The credibility of the witnesses was, of course, for the jury. Whether deceased was warned, whether he heard the warning, if given, or was in a position to hear, and whether he was present and in a position to hear Ray deliver the Talbott message, and like matters, were questions for the determination of the jury. Appellant's brief points will be taken up in the order in which they are presented.

1. It is thought by appellant that, if the verdict of the jury is bottomed on the idea of contributory negligence, it is without foundation, and is contrary to law and the evidence; that deceased was neither negligent in law nor in fact, and that we should so say. Cases are cited holding that, where persons have been injured or killed by laying hold of insulated wires, such persons may not be held guilty of negligence, as a matter of law, and nonsuits granted on that ground have been set aside. We think that does not quite meet the situation. In this case, the court did not hold, as a matter of law, that deceased was guilty of contributory negligence, but submitted the question to the jury; and we think the evidence was sufficient to sustain a verdict for the defendant on that ground, if that was the finding of the jury. It seems to us this was probably the vital point in the case. It seems to have been defendant's principal reliance. We have no means of knowing the ground upon which the jury returned a verdict for the defendant. We shall not restate the evidence. The jury could have found that deceased heard the Talbott message in regard to getting the horses out, because it was dangerous, and that deceased was warned not to take hold of the wire. Taking these matters, and all the other circumstanc-

es and conditions, we have no doubt of there being a jury question as to this issue. There is some complaint in argument about the refusal of the court to give Instructions 5 and 6, offered by plaintiff, on the question of contributory negligence. The offered instructions are quite lengthy, and enumerate many of the circumstances in regard to the situation and the conditions; but we think Instruction No. 8, given by the court, fully covered the question. We see nothing in the record that would tend to excite passion or prejudice against the plaintiff and in favor of the defendant.

2. Appellant further contends that, if the verdict is based on the finding of freedom from negligence on the part of defendant, it is contrary to law and contrary to the evidence. It may be conceded that it was a jury question whether defendant was negligent, and a finding to that effect by the jury would have ample support in the testimony.

3. Appellant's next contention is that the fundamental error, the error to which should be attributed the action of the jury in finding for defendant, is that the court, in the instructions in dealing with the question of defendant's negligence, dealt only with the original setting of the pole, which fell, and omitted the alleged negligence of defendant with respect to the subsequent maintenance of it. It is contended that the instructions given told the jury, in substance and effect, that, if the pole was originally properly and securely set, the defendant should be found to have done its duty, regardless of the fact that, after said pole was originally set, the same was not properly and securely maintained; that, under the issues, it was not the original placing or setting of the pole, but the subsequent failure to maintain the same securely, that was the negligence alleged as being the cause of the danger to deceased. In-

2. TRIAL: instructions: pleadings control.

structions 3, 7, and 10 are the ones complained of.  It will be observed that the petition heretofore set out first alleges that the pole had not been, and was not, set in the ground by defendant, but had been merely placed in a pile of ashes, which ashes had worked away, and permitted the pole to fall.  But the specific charge of negligence, made later in the petition, is in failing to place and set said pole firmly in the ground for the support of the same.  It must be conceded, we think, that the last clause is not as broad, as applied to the question now presented in regard to the maintenance, as the first allegation.  This, and the further fact that counsel for plaintiff stated to the court, during the trial, or at the close of defendant's testimony, that one of the things for the consideration of the jury "is the negligence of the defendant in reference to the setting of that pole," may have misled the court.  The statement of counsel just mentioned is, to say the least, not very definite or specific as to the maintenance of the pole.  Appellee contends that the instructions given by the court do cover the point now under consideration, and that the instructions given were more favorable to plaintiff than he was entitled to, under the pleadings and the record.  In stating the issues, the court said that the plaintiff alleges:

"That, at the time of the death of the deceased herein, the said pole, supporting said wires in question, which fell, as aforesaid, had not been and was not set in the ground by the defendant herein, but had been merely placed in a pile of ashes and cinders, which worked away and permitted said pole to fall.  That said pole was not properly supported in said position.  *  *  *"

Appellant says that this is in harmony with the petition, and we think it is, as to the first allegation before pointed out; but the complaint now is that Instructions 3, 7, and 10 are inconsistent with the one wherein the court stated the issue, and inconsistent with and contrary to an

offered instruction by plaintiff, and contrary to plaintiff's theory of the case. A part of the offered instruction follows:

"Should you find from the evidence that the said pole, located in said pile or mound of cinders, as described by the testimony, was not securely set in such a manner as to reasonably prevent its fall, then the defendant was negligent in respect to the maintenance of said pole in such insecure footing; if you find it was insecure, and, in the event of your so finding, the defendant would be responsible for damages resulting to the said Hugh Cullen or his estate as the direct and sole consequence of such negligent maintenance of said pole in said position, if you find it was negligently maintained in that position."

As said, appellant contends that the instructions of the court relate exclusively to the original setting of the pole; but the court did not so state to the jury, and we think the instructions are not susceptible of that construction. The offered instruction is somewhat broader than the allegations of the petition. The petition did not use the word "maintain." The complaint seems to be more particularly with reference to the failure of the court to use the word "maintain" or "maintenance," and it is true the court did not use that word; but we think the language used in the instruction is equivalent thereto, and at least as broad as the petition. Taking the instructions altogether, we think they are in harmony with the allegations of the petition, and that the jury could not have been misled into thinking that the court referred only to the original setting. It seems to us that the jury must have understood that the court referred to the condition of the pole at the time it fell, and that such condition related to the cause of its falling. The evidence was directed more especially to the setting of the pole: that it was set in a pile of cinders; was not securely set in the ground; that some of the

cinders had been removed, etc.   In Instruction No. 1, in
stating the propositions to be proved, the court said, among
other things, that one of them was "that the defendant was
negligent in one or more respects, substantially as charged
by the plaintiff, and set out herein."   The court, in stating
the issues, copied the language of the petition.   In No. 2, it
was stated that plaintiff must establish "that the defend-
ant company was guilty of the particular act or acts of
negligence charged in the petition and set out herein," and
that the jury should consider such acts of negligence al-
leged on the proximate cause of the accident and injury
complained of.   In Instruction No. 3, the court stated that
it was for the jury to determine "whether the defendant
was negligent in any of the particulars, as charged by plain-
tiff and set out herein."   Instruction No. 4 reads, in part,
that, if the jury should find, by a preponderance of the evi-
dence, "that the defendant company, by its officers and em-
ployees, has omitted to do something that a reasonably pru-
dent person would do, or has done something that such a
person would not do," it would be warranted in finding the
defendant guilty of negligence, etc.   Instruction No. 5
reads, in part, that the defendant could be held liable for
the damages which resulted from injury "caused by some
act of negligence of the defendant, charged by the plaintiff,
as herein set out, and proven by a preponderance of the evi-
dence on this trial."   A part of Instruction No. 7 reads:

"The defendant company, in placing and locating its
poles carrying electric wires must exercise ordinary care,
as herein defined, to see that such poles be properly and se-
curely set in the earth;" and that the jury should take
into consideration, as shown by the evidence, the character
of the ground or soil in which it was set, how and when it
was set, and "what notice, if any, the defendant company
had of any defect in the setting of said pole at the time of
its placement, or thereafter."   A part of appellant's offered

instruction, before set out, reads that, if the jury should find that the pole, located in the cinders, as described in the testimony, "was not securely set, in such a manner as to reasonably prevent its fall, then the defendant was negligent in respect to the maintenance of said pole in such insecure footing," etc. There is nothing in this, nor, indeed, in any of appellant's offered instructions in regard to the removal of the cinders. The thought expressed was that, if the pole was not securely set, etc., then defendant was negligent in respect to the maintenance. As said, we think the language of the instructions is as broad as, if, indeed, it is not broader than, the allegations in the petition, counsel's statement to the court, and the offered instructions, except as to the use of the word "maintenance." We think the jury would not consider the matter in any other way than that of the condition of the pole as regards its setting and security at the time it was set, and thereafter down to the date of/the accident. The evidence showed that defendant had notice of the removal of the cinders, and the reference to such notice by the court could not have referred to anything else. It may be that the instructions are not as clear as they might have been on the subject; but, as said, they are in harmony with the allegations of the petition, and the statement by counsel to the court.

Some members of the court are inclined to think that the conditions in regard to the pole are out of the case, and that it is doubtful whether that is the proximate cause of the injury. Others think that the condition of the pole was so related to the transaction as that plaintiff was entitled to have the case submitted to the jury on his theory. We have so treated it in the opinion, and our conclusion is that the case was submitted on plaintiff's theory.

We find no prejudicial error, and the judgment is, therefore,—*Affirmed.*

Weaver, C. J., Ladd, Evans, and Salinger, JJ., concur.